STANDARD MUTUAL INSURANCE COMPANY, Plaintiff and Counter-defendant-Appellee, v. SENTRY INSURANCE OF ILLINOIS, INC., Defendant and Counterplaintiff-Appellant (Kathi Lynn Wigfield *et al.*, Defendants and Counterdefendants-Appellees; Sentry Insurance of Illinois, Inc., Defendant and Third-Party Plaintiff-Appellant; v. Robert Saffer *et al.*, Third-Party Defendants-Appellees).

First District (3rd Division)   No. 85—1026

Opinion filed August 20, 1986.

Stephen M. Passen, of Stephen M. Passen, Ltd., of Chicago, for appellant.

Van Duzer, Gershon, Jordan & Petersen, of Chicago (Horace W. Jordan, of counsel), for appellee Standard Mutual Insurance Company.

Steven B. Salk, of Chicago, for appellee John Bormet.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Plaintiff, Standard Mutual Insurance Company (Standard), filed a complaint for declaratory judgment against Sentry Insurance of Illinois (Sentry), Kathi Lynn Wigfield and John Bormet. Plaintiff sought

a declaration of the rights of the parties under automobile insurance policies issued by Standard and Sentry. Sentry filed a counterclaim against Standard, Wigfield and Bormet to adjudicate the rights and liabilities of the parties. Sentry also filed a third-party complaint against Robert Saffer and Naida Saffer seeking to adjudicate that Wigfield is covered by the Standard policy for any claims resulting from the accident of April 9, 1983. The trial court ruled that Wigfield was not entitled to any coverage under the insurance policy issued by Standard and that Standard was not obligated to defend Wigfield in connection with the April 9, 1983, accident between Wigfield and Bormet. The trial court further held that Wigfield was entitled to coverage under the insurance policy issued by Sentry and that Sentry was obligated to defend Wigfield relative to the above specified accident. Sentry's post-trial motion was denied. Sentry appeals.

On March 30, 1983, Wigfield visited the home of Robert and Naida Saffer, at which time she was hired to housesit and care for their daughter, Deborah, while they were in Florida. Wigfield testified that she believed her duties were to start on April 8, 1983. During the visit, Mrs. Saffer gave Wigfield the keys to the house, told her that she would be paid $30 a day, and explained that her duties would include preparing meals and taking Deborah to and from various activities. Wigfield assumed that her duties also included activities such as collecting the mail, buying necessary groceries, and making sure that doors were locked, windows closed, and lights turned on and off at the appropriate hours. She and Mrs. Saffer did not discuss whether Wigfield would use her 1974 Chevrolet Vega or the Saffers' 1983 Cadillac Eldorado. Additionally, there was no discussion regarding reimbursement for expenses such as gasoline, and the only time Wigfield saw the Cadillac was when Mrs. Saffer took her into the garage to show her where soft drinks were stored. The Saffers did not give Wigfield any keys to the Cadillac. Mrs. Saffer took her set of keys with her to Florida, and Mr. Saffer testified that he left his in the bedroom in the top dresser drawer under some underwear. According to Wigfield, Mrs. Saffer told her that she could sleep in the couple's bedroom when she stayed in the house.

Sometime prior to April 8, Mrs. Saffer informed Wigfield that Deborah would return to Chicago from Florida on April 12 rather than on April 8. Wigfield agreed to pick her up at the airport. Wigfield testified that she still believed her duties would begin on April 8 and that she could move into the Saffer home at that time. She decided to move into the home on April 12 upon Deborah's arrival. Between April 8 and 12, Wigfield planned to check the home to turn the

lights on in the evening and collect the mail. She assumed that she could use the Saffer car during the course of her job.

While on her way to a class on the morning of April 8, 1983, Wigfield observed that her Chevrolet Vega swerved when she applied the brakes. She testified that she attempted to phone the Saffers in Florida to ask if she could use their car prior to Deborah's arrival on the 12th, but she was unable to reach them. Wigfield stated that she also phoned one repair shop and was informed that her car could not be serviced on that day. During her lunch break, Wigfield drove the Vega to the Saffer home, where she located the Cadillac keys in the dresser drawer. She then drove the Cadillac back to school and, late in the afternoon, to her apartment. At approximately 12:15 a.m. on April 9, 1983, Wigfield was involved in an accident while driving the Saffers' car.

John Bormet, the party allegedly injured in the accident, thereafter brought suit against Wigfield and the Saffers. The Saffers were insured under an automobile liability policy issued by Standard for their 1983 Cadillac. Under this policy, the named insureds as well as any other resident of the same household were covered. Additionally, the policy provided that "any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission" would also be covered.

Wigfield was the named insured under an automobile policy issued by Sentry, which listed her 1974 Chevrolet Vega as the insured vehicle. The policy contained the following provisions relevant to this action:

"CARS WE INSURE
***

We insure a substitute *car* when the *car* described on the declarations page, or any replacement or addition, can't be used because it's being serviced or repaired, or it's [*sic*] been stolen or destroyed. ***

We insure other *cars* *you* use with the permission of the owner. This doesn't include *cars* owned by you or furnished for the regular use of, *you* or resident members of *your* family.
* * *

OTHER INSURANCE
* * *

This insurance is primary for any *car* described on the declaration page or any additional or replacement *car* we insure.

This insurance is excess for the use of any *car* not owned by

*you."* (Emphasis in original.)

After hearing the evidence presented, the trial court found that: (1) Wigfield did not have actual or implied permission from either Robert or Naida Saffer to use their car on the day of the accident; (2) Wigfield was not a resident of the Saffer household; and (3) at the time of the accident, Wigfield was using the Saffer car as a substitute car because her own was being serviced or repaired. The court thus declared that Sentry was obligated to defend and indemnify Wigfield in connection with Bormet's claim for his alleged injuries.

Sentry appeals the trial court's determination, contending that: (1) the trial court erred in finding that Wigfield did not have implied permission to drive the Saffer vehicle at the time of the accident; (2) the court erred in finding that Wigfield was driving the Saffer vehicle as a substitute car at the time of the accident; (3) as an insurer of the driver of a nonowned vehicle, Sentry is obligated to provide only excess coverage in connection with Bormet's claim for damages; and (4) in the event that both the Standard and Sentry policies are found to provide primary or excess coverage, the loss should be prorated between the carriers.

A trial court's findings are always subject to review; however, a reviewing court will not disturb such findings unless they are contrary to the manifest weight of the evidence. (*In re Estate of Becton* (1985), 130 Ill. App. 3d 763, 769, 474 N.E.2d 1318.) In *Schulenburg v. Signatrol, Inc.* (1967), 37 Ill. 2d 352, 356, 226 N.E.2d 624, the supreme court clarified this rule as follows:

"Underlying this rule is the recognition that, especially where the testimony is contradictory, the trial judge as the trier of fact is in a position superior to a court of review to observe the conduct of the witnesses while testifying, to determine their credibility, and to weigh the evidence and determine the preponderance thereof. We may not overturn a judgment merely because we might disagree with it or might, had we been the trier of facts, have come to a different conclusion."

■ Sentry urges this court to find that, contrary to the trial court's determination, Wigfield had implied permission to use the Saffers' vehicle at the time of the accident. We disagree with Sentry's interpretation of the facts and do not believe that the court's finding on this matter was against the manifest weight of the evidence.

■ Implied permission exists where there is an inference or circumstances arising out of a course of conduct or a relationship between the parties whereby there is mutual acquiescence or lack of objection under circumstances that generally would indicate permission.

(*Lumbermans Mutual Casualty Co. v. Poths* (1968), 104 Ill. App. 2d 80, 89, 243 N.E.2d 40.) Nevertheless, although there need not be affirmative action to establish that permission was given, there was no evidence before the court which, in our view, would have signified that Wigfield had permission to use the Cadillac. For example, the car keys were not left in a place by which one could infer that permission was granted, and neither party involved ever mentioned Wigfield's use of the Saffer vehicle. Further, Wigfield's testimony that she assumed she could use the car because she had previously used those of others for whom she housesat was inconsistent with her testimony that she attempted to phone the Saffers in Florida to request permission to use the car on April 8. Given these circumstances, the trial court's finding that Wigfield did not have actual or implied permission to use the vehicle named in the Standard insurance policy is not contrary to the manifest weight of the evidence.

■ Sentry further contends that the trial court's finding that Wigfield used the Saffer vehicle as a temporary substitute is erroneous. In construing contracts of insurance, courts are to follow the general contract rule that the agreement should be viewed as a whole to determine the intention of the parties to the contract and the purpose which they sought to accomplish. (*Nationwide Insurance Co. v. Ervin* (1967), 87 Ill. App. 2d 432, 436, 231 N.E.2d 112.) Where the provisions are not ambiguous, a court should enforce them according to their plain meaning. *Thornton v. Illinois Founders Insurance Co.* (1981), 84 Ill. 2d 365, 371, 418 N.E.2d 744; *Uhwat v. Country Mutual Insurance Co.* (1984), 125 Ill. App. 3d 295, 303, 465 N.E.2d 964.

■ A typical "substitution" provision generally covers a vehicle not owned but temporarily used by the insured because the owned vehicle has been withdrawn from normal use due to breakdown, repair, servicing, loss or destruction. (See 7 Am. Jur. 2d *Automobile Judgments* sec. 236 (1980).) Although we are unable to locate Illinois decisions which discuss the purpose of such a provision, courts in other jurisdictions have specifically addressed this issue. These decisions indicate that a typical provision is for the benefit of the insured and, if construction is necessary, it is to be construed liberally in favor of the insured. (See, *e.g., Transit Casualty Co. v. Giffin* (1974), 41 Cal. App. 3d 489, 492-93, 116 Cal. Rptr. 110, 112; *St. Paul Fire & Marine Insurance Co. v. Nyquist* (1970), 286 Minn. 157, 159, 175 N.W.2d 494, 496; *VanMinos v. Merkley* (1975), 48 App. Div. 2d 281, 285, 369 N.Y.S.2d 246, 250; *Farley v. American Automobile Insurance Co.* (1952), 137 W. Va. 455, 457, 72 S.E.2d 520, 521.) It has been stated further that the purpose of a temporary-substitute-automobile provi-

sion is not to defeat liability but, rather, to provide additional coverage for the insured, yet reasonably define coverage by limiting the insurer's risk to one operating vehicle at a time for a single premium. (*State Farm Mutual Automobile Insurance Co. v. Johnston* (1973), 9 Cal. 3d 270, 273, 107 Cal. Rptr. 149, 151, 507 P.2d 1357, 1359; *Van-Minos v. Merkley* (1975), 48 App. Div. 2d 281, 285, 369 N.Y.S.2d 246, 251; *Nelson v. St. Paul Mercury Insurance Co.* (1967), 83 S.D. 32, 38, 153 N.W.2d 397, 399-400.) We agree with such interpretations.

■ In the instant case, Sentry contends that the trial court's finding that Wigfield used the Saffer automobile as a temporary substitute for her Chevrolet Vega was improper because the policy provision covers a substitute only when the owned vehicle is being serviced or repaired and not under other conditions. We believe that Sentry's interpretation of the provision is unduly restrictive and would defeat the purpose of the inclusion of such a provision in the policy if so construed. Wigfield's testimony revealed that she attempted to get her Vega repaired on April 8 prior to deciding to use the Saffer vehicle. It is evident that Wigfield's determination that the car was unsafe to drive and in need of repair led her to withdraw it from normal use. Such circumstances bring her use of the Saffers' car within the "substitution" provision of the Sentry policy. We therefore hold that the trial court's finding that the vehicle was a temporary substitute was not contrary to the manifest weight of the evidence presented. On this basis, Sentry is obligated to defend and indemnify Wigfield in the personal injury action, and we need not address Sentry's further contentions that it provide only excess coverage or coverage on a *pro rata* basis.

For the foregoing reasons, the order of the circuit court of Cook County is affirmed.

Affirmed.

RIZZI, P.J., and McNAMARA, J., concur.