LILLIAN BURRGESS KOSROW, Personal Adm'r of the Estate of Mary Ann Hoffman, Deceased, *et al.*, Plaintiffs-Appellees, v. RONALD S. ACKER, Defendant (Jeffrey C. Smith, Defendant-Appellant).

Second District   No. 2—88—1011

Opinion filed August 30, 1989.—Rehearing denied October 26, 1989.

Myron J. Hall, of Myron J. Hall, Ltd., of Waukegan, for appellant.

Robert J. Long, Mark B. Belokon, and Marcia A. Korducki, all of Law Offices of Robert J. Long, Ltd., of Antioch, and James Borosso, Richard D. Heytow, and Peter Alfieri, all of Crystal & Heytow, of Chicago, for appellee Carl E. Robinson.

Robert J. Long, Mark B. Belokon, and Marcia A. Korducki, all of Law Offices of Robert J. Long, Ltd., of Antioch, and Robert J. Schuckit and Robin R. Lunn, both of Keck, Mahin & Cate, of Chicago, for appellee Richard J. Byrne.

Robert J. Long, Mark B. Belokon, and Marcia A. Korducki, all of Law Offices of Robert J. Long, Ltd., of Antioch, for appellee Lillian Burrgess Kosrow.

JUSTICE DUNN delivered the opinion of the court:

Plaintiffs, administrators of the estates of Mary Hoffman, Beverly Robinson, and Colleen Byrne, brought suit against Ronald Acker and Jeffrey Smith. Decedents were killed in an auto accident when their car was hit by a Cadillac owned by Smith and driven by Acker. Acker, who was the only occupant of the Cadillac at the time of the accident, admitted liability and does not appeal.

Plaintiffs sued Smith for negligent entrustment of his automobile. At the close of plaintiffs' case, Smith moved for a directed verdict. This was denied, as was Smith's motion for directed verdict at the close of all the evidence. The jury found Smith liable for negligent entrustment and awarded Mary Hoffman's estate $1,005,481; Beverly Robinson's estate, $504,429; and Colleen Byrne's estate, $535,233. In a post-trial motion, Smith moved to vacate the denial of his motion for directed verdict and grant judgment in his favor notwithstanding the verdict. Smith appeals the denial of this motion, raising three issues: (1) whether the jury's verdict was against the manifest weight of the evidence; (2) whether the court erred in allowing testimony of grief and sorrow of the next of kin; and (3) whether the court erred in instructing the jury as to the elements of damage. We address only appellant's first issue as we find, for the reasons stated below, that the jury verdict cannot stand.

The evidence relevant to this issue includes the following.

Defendant, Jeffrey Smith, testified as follows: At the time of the accident, he was 16. His father had purchased a Cadillac for him in June 1984. He had two sets of keys to the car. No other family members had a set. He kept one set in a locked box in his bedroom closet, and he usually kept the other set with him.

On March 1, he was at home from 3:30 p.m. to 7 p.m. At 7 p.m. he went out with some friends. He did not drive the Cadillac. Instead, he took his father's Bronco because it had a cassette player. He left his Cadillac keys on his bedroom dresser that night, according to a statement he later made to a police officer. At trial he stated he left his keys in an area in the dresser that was five inches high and deep, not a flat surface of a top of a dresser. He did not talk to Acker at all on March 1. Later that night, during the early morning hours of March 2 while returning home, he came to traffic stopped on Route 176. He saw lights indicating an accident, but he did not see any damaged vehicles. He turned around and took a different route home. Arriving home, he parked the Bronco about 25 feet from where the Cadillac had been parked. He went inside and went to bed. He did not see the Cadillac when he parked the Bronco, but he did not recall looking for it when he came home.

The next morning he was told that Acker had been in an accident with his car. He rode his bicycle to work. After he returned home from work at 4 p.m., he went with his father, at his father's request, to report the Cadillac stolen. He did not want Acker prosecuted, but he wanted a public record that the car was reported stolen.

Defendant testified that Acker, his stepbrother, lived in his family's house from November 1984 to March 1985. The family house had two bedrooms upstairs and one bedroom downstairs. There was also a room upstairs that had previously been a bedroom and was now a closet. He shared the downstairs bedroom with his brother, Robert, until Robert moved out sometime before March 1, 1985. Defendant did not share his bedroom with Acker. He said Acker slept on the couch in the living room.

Defendant said there were no times when he let Acker drive his car. Acker asked for the car a number of times, but he refused him permission. Specifically, he did not let Acker drive them to a Union 76 station. Defendant did drive Acker places on a number of occasions. He knew Acker's license had been suspended for driving under the influence, but he did not recall being told of a family policy to not allow Acker use of the family cars.

Ron Acker testified as follows: He does not recall the accident or how he came into possession of the Cadillac. On March 1, he was at

the Smith house from 5 to 7 p.m. He went out at 7 p.m. and came back at about 8:30 p.m. He went back out at about 9:30 p.m. He vaguely remembers pulling the Cadillac out of the driveway. He does not recall asking defendant for his keys, nor did he know where defendant kept his keys.

Acker knew defendant did not want anyone to drive his car. Though defendant never explicitly told him not to drive the Cadillac, he implied so. Acker had driven the car once around the block in January 1985 in connection with repairs he made at defendant's request. Also, in June 1984, he started the engine after he worked on the car, but he did not remember driving it at this time. He had been a passenger in the car with defendant at least 10 times, but he never drove. He did not recall driving defendant to a Union 76 station. Before the accident he had been allowed to drive Robert Smith's Bronco and Christine Smith's Lincoln Continental when he asked their permission, but he had not driven either car for several months prior to the accident. He stated that no one in the house ever told him he could not drive their car.

Acker testified he slept on the living room couch 50% to 70% of the time he spent in the Smith house. The other times he slept in defendant's bedroom and on the floor. He did not have use of defendant's dresser, though he had use of a dresser in the laundry room in the basement and one upstairs.

Robert Smith, defendant's father, testified as follows: It was common family knowledge that Acker's license had been suspended for driving under the influence of alcohol. He set a family policy, which he communicated to defendant, that Acker was not allowed to drive any of the family's vehicles. On March 1, he did not give defendant the keys to the Bronco. He believed defendant took the Lincoln Continental, but he did not see him leave that night. He accompanied his son to the police station to report the car stolen. He heard defendant tell the officer he believed Acker went into his room and took the keys from the top of his dresser, his room meaning defendant's. Acker rarely slept in defendant's bedroom. He usually slept on the living room couch.

Christine Smith testified by a video-taped evidence deposition as follows: Acker slept on the couch or the floor in February and March 1985. He did not have his own dresser. She had let him use her car when he asked for permission until she learned he had problems with his license. Then she refused him permission. Defendant knew of Acker's license problem and knew he was not to let Acker drive his car. She added that defendant never let anyone drive his car to begin

with. She never saw Acker drive the Cadillac. She stated that Acker was frequently drunk during the six months prior to the accident. He had asked her permission to use the car when he was drunk and she refused.

Sergeant Arquilla testified that he took the theft complaint made by defendant and his father. He recalled that defendant told him Acker must have gone into his room and taken the keys off his dresser. Defendant said it was in Ron's room on his dresser. On cross-examination, Arquilla stated that it was merely his interpretation from defendant's statement that defendant was referring to Ron's bedroom rather than his own.

Officer Thomas Larkin testified that within six months of the accident he saw Acker driving the Cadillac into a Union 76 Station with defendant as a passenger.

■ In his first issue on appeal, defendant asks this court to enter judgment for him because the verdict is against the manifest weight of the evidence. We point out, however, that a court will not direct a verdict upon a finding that a jury's verdict is against the manifest weight of the evidence. Rather, this finding results only in a new trial. (See *Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, citing *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 509 (which held that it had "rather carefully preserved the distinction between the evidentiary situation which will require a new trial (verdict against the manifest weight of the evidence (*Lau v. West Towns Bus Co.*, 16 Ill. 2d 442, 451, *cert.* den. 361 U.S. 127), and that justifying direction of a verdict or judgment *n.o.v.*")).) Under *Pedrick*, a verdict will be directed only where all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick*, 37 Ill. 2d at 510.) Thus, we will consider whether the trial court should have granted judgment *n.o.v.* under *Pedrick*.

■ A person may be liable for negligent entrustment of an automobile where that person entrusts an automobile to one whose incompetency, inexperience or recklessness is known or should have been known by the owner or entrustor of the automobile. (*Giers v. Anten* (1978), 68 Ill. App. 3d 535, 538; *Bensman v. Reed* (1939), 299 Ill. App. 531.) The jury was instructed to find defendant liable if defendant gave Acker either express or implied permission at any time to use his auto on March 2. We note that we have found no case law on negligent entrustment of an automobile in Illinois which specifically defines the act of entrustment as the giving of express or implied permission. The cases cited in appellant's brief (*Standard Mutual*

*Insurance Co. v. Sentry Insurance of Illinois, Inc.* (1986), 146 Ill. App. 3d 905; *MFA Insurance Cos. v. Mendenhall* (1980), 205 Neb. 430, 288 N.W.2d 270) that discuss express and implied permission do not involve negligent entrustment. Rather, these cases concern insurance contracts where the operative clause in the contract uses the word "permission." Thus, these cases are not necessarily controlling here. We believe, nonetheless, that defining entrustment as giving express or implied permission is proper. In *Teter v. Clemens* (1986), 112 Ill. 2d 252, 257, a case involving negligent entrustment of a gun to a young child, the supreme court cited the Restatement (Second) of Torts §308 (1965), which states:

"Permitting Improper Persons to Use Things or Engage in Activities

It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others."

As cited in *Teter*, the Restatement (Second) uses the word "permit" to describe the negligent act.

■ It has been held that permission may be implied. (*Lumbermens Mutual Casualty Co. v. Poths* (1968), 104 Ill. App. 2d 80; *Standard Mutual Insurance Co.*, 146 Ill. App. 3d 905.) "Implied permission exists where there is an inference or circumstances arising out of a course of conduct or a relationship between the parties whereby there is mutual acquiescence or lack of objection under circumstances that generally would indicate permission." *Standard Mutual Insurance Co.*, 146 Ill. App. 3d at 909; *Lumbermens Mutual Casualty Co.*, 104 Ill. App. 2d at 89.

■ We find that in this case the evidence completely fails to establish either express or implied permission. Viewed in a light most favorable to the plaintiff, the evidence shows the following:

(1) a police officer saw Acker driving the car with defendant as a passenger within six months before the accident;

(2) Acker drove the car once around the block in connection with repairs he made at defendant's request in January 1985;

(3) Acker made repairs to the car in June 1984, and he started the engine;

(4) Acker had been a passenger in defendant's car with defendant on several occasions;

(5) defendant went out that night driving his father's vehicle

instead of his own car;

(6) Sergeant Arquilla stated defendant said he left his keys in Ron's room on his dresser;

(7) defendant did not notice that his car was missing when he returned home that night;

(8) defendant reported the car stolen after his father directed him to, but defendant did not want to see Acker prosecuted.

■ These facts do not establish that defendant gave Acker either express or implied permission to use his car on the day of the accident. Plaintiffs argue that evidence that Acker drove defendant's car on two prior occasions indicates that he would have had permission on the day of the accident. Negligence may be proved with circumstantial evidence provided that the inferences drawn from the evidence are reasonable. (*Laflin v. Estate of Mills* (1977), 53 Ill. App. 3d 29, 32.) An inference of negligence cannot be established on inferences which are merely speculative. (*Laflin*, 53 Ill. App. 3d at 32.) Even assuming that Acker drove the car on these instances with defendant's permission, we do not believe this supports a reasonable inference that Acker had permission on the day of the accident.

■ This evidence merely shows two isolated instances where Acker drove defendant's car. One instance was for the limited purpose of checking repair work done by Acker. Little is known about the other instance, except that a police officer saw Acker driving the car with defendant in the passenger seat. It cannot be reasonably inferred from these two isolated instances that defendant expressly gave Acker permission on the day of the accident. Nor can it be reasonably inferred that these two instances show mutual acquiescence or a lack of objection under circumstances that would indicate that Acker had implied permission. There is no other evidence which establishes that these isolated instances were reflective of a regular practice in which defendant allowed Acker to use his car. Furthermore, there is overwhelming evidence to the contrary. Acker testified that he knew defendant did not want him driving his car. Defendant testified that he did not allow Acker to use his car, and defendant's stepmother testified that defendant did not let anyone use his car.

■ Plaintiffs also contend there is sufficient evidence to show that defendant gave permission to Acker on March 1 by leaving his keys for Acker. We disagree. Defendant testified that he left his keys on his bedroom dresser. Acker testified that though he sometimes slept in defendant's bedroom, he had no access to the dresser and did not feel he could take anything from the dresser. We do not believe that defendant's act of leaving his keys on his private bedroom

dresser is sufficient to establish express or implied permission.

Plaintiffs contend that Sergeant Arquilla's testimony establishes that defendant left his keys in Acker's bedroom on Acker's dresser. We note that if the facts established that Acker had his own bedroom and defendant left the keys on Acker's dresser, then we would find a strong case for drawing an inference of permission. We do not believe, however, that Sergeant Arquilla's testimony establishes these facts.

On direct examination, Sergeant Arquilla gave the following testimony regarding defendant's explanation of how Acker acquired possession of the car keys: "He said as far as he could assume at that time, that when Ron Acker was left at home, he went into his bedroom and had taken the keys from where they were on top of the dresser."

When asked if defendant made an indication as to whose room and whose dresser, Arquilla responded: "He did. He said it was in Ron's room on his dresser." On cross-examination, however, Sergeant Arquilla testified he did not write in quotes what defendant told him, and what he wrote in his report was an impression of what defendant told him. He was merely giving his own interpretation of defendant's words when he said defendant was referring to Ron's bedroom rather than his own. Thus, by Arquilla's admission, defendant did not make the statement that the keys were in Ron's room on his dresser. Arquilla's testimony was mere speculation.

We add that the evidence established that Acker did not have his own bedroom with a dresser. Acker testified he slept on the living room couch 50% to 70% of the time. The other times he slept on the floor or in defendant's bedroom, where he did not have use of defendant's dresser. Acker did testify that he had use of two other dressers in the house, one in the basement laundry room and one upstairs, but the record does not establish that Acker had a bedroom with a dresser.

The evidence taken in the light most favorable to the plaintiffs fails to establish that defendant negligently entrusted the car to Acker. The evidence so overwhelmingly favors defendant that we find the verdict cannot stand. Defendant's motion for a directed verdict and judgment *n.o.v.* should have been granted. Therefore, we reverse without remandment.

Reversed.

INGLIS and NASH, JJ., concur.