Susan LeCAVE, et al., Appellant,

v.

James HARDY, Respondent.

No. ED 79242.

Missouri Court of Appeals,
Eastern District,
Division Five.

Jan. 29, 2002.

Application for Transfer to Supreme Court Denied April 17, 2002.

Application for Transfer Denied
May 28, 2002.

V. Scott Williams, Hazelwood & Weber, LLC, St. Charles, MO, for appellant.

Debbie S. Champion, Rynearson, Suess, Schnurbusch & Champion, L.L.C., St. Louis, MO, for respondent.

JAMES R. DOWD, Chief Judge.

John LeCave was killed on October 16, 1997, when a Camaro driven by James Hardy, II struck the bicycle he was riding.[1] LeCave's widow, Susan LeCave, and their four children, Sean, Dawn, Aaron, and Dustin, brought wrongful death suits against both Junior and his father, James Hardy, alleging that Junior drove negligently and that Senior had negligently en-

---

1. The two original defendants in this case bear the same first and last names. In conformity with the record below, we refer to James Hardy, II as "Junior" and James Hardy as "Senior."

trusted Junior with the car. The trial court granted summary judgment in favor of Senior on the claim that he negligently entrusted his automobile to Junior. After Junior filed a Suggestion of Bankruptcy, the LeCaves voluntarily dismissed their claim against him, without prejudice, and now appeal the grant of summary judgment in favor of Senior. We reverse and remand.

■ When considering an appeal from a grant of summary judgment we view all evidence and draw all inferences in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.1993). That evidence and those inferences are as follows:

Junior was 21 years old at the time of the accident. Between the ages of 16 and 21 Junior incurred convictions for seven speeding violations, one "following too close" violation, and one "careless and imprudent" violation. Two weeks before the accident he was again ticketed, resulting in a conviction for speeding. His license had previously been suspended and he had a mandatory insurance suspension. He lived at Senior's house in Chesterfield and was attending St. Louis Community College at Meramec, approximately 18 miles away. He worked at Tan USA in Ellisville, approximately 8 miles from home. Junior's car had thrown a rod earlier in the year and was not running.

On October 16, 1997, at approximately 6:30 p.m., Junior took Senior's Camaro and was driving northbound on Highway 109 on his way to school. It was still light outside. LeCave was ahead of him on his bike, also riding northbound on Highway 109. On a straight section of that road, with no cars approaching in the southbound lane, Junior came up from behind LeCave and struck his bicycle. LeCave

was thrown into the passenger side of the car and his head shattered the front windshield and the passenger-side sunroof. Junior pulled over and attempted to assist, but Mr. LeCave was dead. The police responded to investigate. At that time Junior told St. Louis County Police Officer Nick Wild that he "customarily drove" the Camaro "back and forth from school."

LeCave's widow and four children sued both Junior and Senior for the wrongful death of their husband and father, alleging that Junior drove negligently and that Senior had negligently entrusted his son with the Camaro. Senior filed a motion for summary judgment with supporting affidavits and depositions. The LeCaves filed a response controverting some of Senior's factual assertions and arguing that the uncontroverted evidence combined with their proof on the disputed issues created material questions of fact for a jury. The trial court granted Senior's motion. The LeCaves appeal.

■ To prevail in their negligent entrustment claim the LeCaves must prove *each* of the following: (1) Junior was incompetent to drive the Camaro by reason of age, inexperience, habitual recklessness, or otherwise, (2) Senior knew or had reason to know of Junior's incompetence, (3) Senior entrusted the Camaro to Junior and (4) Senior's negligence concurred with Junior's negligence as a proximate cause of LeCave's death. *Evans v. Allen Auto Rental & Truck Leasing*, 555 S.W.2d 325, 326 (Mo. banc 1977); RESTATEMENT (SECOND) OF TORTS § 390 (1965). Where a "defending party," as in this case, will not bear the burden of persuasion at trial, that party may establish a right to judgment by showing facts that negate *any one* of the claimant's elements. *ITT Commercial Finance Corp.*, 854 S.W.2d at 381.

■ To defeat Senior's motion for summary judgment the LeCaves must set forth facts, through affidavits, depositions, answers to interrogatories or admissions that demonstrate they have affirmative proof or the benefit of a reasonable inference drawn from available evidence to support each element they must prove at trial. *Id.* at 381–82. We determine the propriety of summary judgment by examining the record on each element to determine if there are genuine disputes of material fact that if decided favorable by a jury would enable the LeCaves to prevail at trial.

Senior does not dispute that the LeCaves presented evidence that, if believed, proves their claim that Junior was negligent. Senior argues, however, that the LeCaves cannot prove that (1) Junior was incompetent to drive; (2) Senior knew or had reason to know that Junior was incompetent; or (3) Senior gave Junior permission to drive the Camaro. We address each of these claims.

## I. Was Junior Incompetent?

This case requires us to determine if the LeCaves' evidence is sufficient to serve as the foundation for a finding that Junior was incompetent to drive. The LeCaves maintain Junior's numerous traffic violations and that he was driving uninsured, in violation of Missouri's Motor Vehicle Financial Responsibility Law, § 303.025 RSMo.1994,[2] are sufficient to prove incompetence. Senior first argues that prior traffic violations alone are not enough to establish incompetence to operate a motor vehicle. He then argues that Junior's traffic violations are too old and not of a nature to prove that he was incompetent at the time of the accident. Finally, Senior argues that violating Missouri's Motor Vehicle Financial Responsibility Law is irrelevant in determining Junior's competence to drive.

■ We first address the argument that prior moving violations cannot show incompetence to drive. Senior argues that because Junior was licensed to drive by the State of Missouri, was not intoxicated, and was not otherwise in an emotional or physical state that rendered him incapable of operating a motor vehicle, he is conclusively presumed to be competent to drive. We disagree. The possession of a valid driver's license is not proof that one is competent to drive. The driving habits of an individual will come to the attention of state licensing officials only upon being charged or convicted of an offense. As every driver knows, people are not convicted of moving violations every time they commit one. So, in the extreme case, it is possible to be habitually reckless without being convicted of a single moving violation. For this reason, and because family members and friends are generally in a better position to assess driving habits than the state, possession of a valid driver's license is not conclusive on the question of a person's competence to drive. Simply because Junior had a valid driver's license and was not intoxicated does not prove that he was competent to drive. *See Moore v. McMillian,* 1980 Pa. D. & C. LEXIS 733 at 4, 1980 WL 839 (1980). Missouri, with other states, recognizes that a history of traffic violations is powerful evidence that a driver is incompetent and that a jury can find incompetence solely on the basis of numerous traffic convictions. *See, e.g., Peters v. Henshaw,* 640 S.W.2d 197, 200 (Mo.App. W.D.1982); *Tortora v. General Motors Corp.,* 373 Mich. 563, 130 N.W.2d 21 (1964); *Thompson v. Havard,* 285 Ala. 718, 235 So.2d 853 (1970); *Broesche v. Bullock,* 427 S.W.2d 89 (Tex.

**2.** All statutory references are to RSMo.1994 unless otherwise indicated.

Civ.App.1968); *Swicegood v. Cooper*, 341 N.C. 178, 459 S.E.2d 206 (N.C.1995).

In the alternative, Senior argues that the age and nature of Junior's traffic violations are insufficient to support a finding that he was incompetent at the time of the accident. He points to the dates of Junior's convictions and claims those dates show that most of Junior's offenses occurred in Junior's first year of driving. From this Senior reasons that the relative infrequency of offenses over the last few years is proof that the reckless habits Junior demonstrated in his first year of driving have abated. He stresses that Junior's convictions are all for "ordinary" moving violations; that there were no alcohol-related offenses, no violations for leaving the scene of an accident, no violations relating to injury to a person, and no evidence that the speeding violations endangered anyone.

This is an appeal from the grant of summary judgment. We view all evidence and draw all inferences in the light most favorable to the party against whom judgment was entered. *ITT Commercial Finance Corp.*, 854 S.W.2d at 376. Junior was convicted of speeding on January 7, 1993, of careless and imprudent driving on March 11, 1993, of speeding on June 1, 1993, of speeding on July 28, 1993, of speeding on October 27, 1993 and of "following too close" on November 18, 1993. As a result of these convictions, his license was suspended on January 20, 1994. He received a mandatory insurance suspension on August 24, 1994. His driver's license was not reinstated until November 8, 1994. He was then convicted for speeding violations that occurred on June 16, 1995, June 18, 1996, April 23, 1997, and again on October 3, 1997. This last violation was only two weeks before the fatal accident. In roughly four years of driving, Junior was convicted of ten separate traffic violations. Here, the evidence and inferences favorable to the plaintiff show that after the mandatory insurance suspension Junior never obtained auto insurance, had fewer opportunities to drive, and so fewer opportunities to be ticketed for violations. We also note that Junior had two violations in the six months before the fatal accident. There is, therefore, sufficient evidence for a jury to find Junior incompetent to drive on the basis of his driving record.

Other states have found driving records similar to Junior's sufficient to support a finding of incompetence. In *Tortora*, the Michigan Supreme Court found eleven speeding violations and one reckless driving conviction in five years sufficient to support a finding of incompetence. 130 N.W.2d at 22. In *Thompson*, the Alabama Supreme Court found eight speeding violations, one reckless driving violation, a traffic signal violation and a driving without a license violation within a three-year period sufficient for a jury to find incompetence. 235 So.2d at 857. In *Swicegood*, the North Carolina Supreme Court reversed their court of appeals and held that three "safe movement violations" and six speeding convictions in six years was sufficient evidence to prove incompetence. 459 S.E.2d at 208. The *Swicegood* court provides the following insight:

While the driver in this case does not have convictions for reckless driving or convictions that involve the use of alcohol, his convictions nonetheless indicate that a jury should determine whether he is a reckless or incompetent driver likely to cause injury to others. In the span of six years, this driver accumulated three safe movement violations and six speeding convictions.... Speed limits exist to ensure the safety of the driving public. They are set according to the conditions of the road. Whether a driver exceeds

the limit by fifteen miles per hour in a thirty-five mile per hour zone or a fifty mile per hour zone, he endangers those around him.

*Id.* at 207–08 (citations omitted).

In *Broesche,* the Texas court of appeals found six speeding and one running a red light violation in three years sufficient for a finding of incompetence. 427 S.W.2d at 93. The court there said:

> While proof of only one previous traffic violation is grossly inadequate to establish incompetency or recklessness and proof of two moving violations or accidents within a two year period prior to the accident made the basis of the suit, is probably insufficient, in this case the evidence presents proof of seven citations for moving traffic violations, a warning letter, disciplinary actions and restrictions taken against the minor driver because of his driving. All of the violations occurred within the span of three years prior to the entrustment. We believe that there is evidence and that it is sufficient to show that Charles Rodney Broesche was a reckless and incompetent driver . . .

*Id.* (citations omitted).

The LeCaves also argue that Junior's incompetence to drive is proven by the fact that he was driving without liability insurance, in violation of § 303.025. At the time this accident occurred § 303.025 RSMo. 1994, provided, in relevant part:

> No owner of a motor vehicle registered in this state shall operate the vehicle, or authorize any other person to operate the vehicle, unless the owner maintains the financial responsibility as required in this section. Furthermore, no person shall operate a motor vehicle owned by another with the knowledge that the owner has not maintained financial responsibility un-

less such person has financial responsibility which covers his operation of the other's vehicle.

It is uncontroverted that Senior's insurance company had specifically excluded Junior from its coverage of Senior's vehicles and that Junior carried no insurance of his own. The LeCaves argue that just as drivers under the age of 16 are considered incompetent to drive as a matter of law, those driving without the required liability insurance should also be found incompetent.

 In Missouri an under-aged driver is conclusively presumed to be incompetent to drive an automobile. *Dinger v. Burnham,* 360 Mo. 465, 228 S.W.2d 696, 699–700 (1950); *Thomasson v. Winsett,* 310 S.W.2d 33 (Mo.App.1958); *Amador v. Lea's Auto Sales & Leasing,* 916 S.W.2d 845 (Mo.App. S.D.1996). In *Dinger* the Missouri Supreme Court said:

> The purpose of statutes regulating and effecting automobile traffic on the highways is the promotion of the safety of the public. They are valid exercises of the police power. Automobiles may be safer than horse-drawn vehicles when prudently driven but the special training required for their operation and their potential power to harm when improperly operated imposes a duty to keep them out of the hands of the immature, the incompetent, and the reckless. The facts of the instant case demonstrate the wisdom of the legislation. Our statutes declare that one under the age of sixteen years conclusively does not possess the requisite care and judgment to operate motor vehicles on the public highways without endangering life and property.

Missouri courts are not alone in conclusively presuming under-aged, unlicensed drivers to be incompetent. *See, e.g., Chiniche v. Smith,* 374 So.2d 872 (Ala.1979);

*Hardwick v. Bublitz,* 254 Iowa 1253, 119 N.W.2d 886 (Iowa 1963); *United Gas Pipe Line Co. v. Jones,* 236 Miss. 471, 111 So.2d 240 (1959); *North Carolina–Taylor v. Stewart,* 172 N.C. 203, 90 S.E. 134 (1916); *Keller v. Wellensiek,* 186 Neb. 201, 181 N.W.2d 854 (1970); *Zugel v. Miller,* 100 Nev. 525, 688 P.2d 310 (1984); *Laubach v. Colley,* 283 Pa. 366, 129 A. 88 (1925); *Atkins v. Churchill,* 30 Wash.2d 859, 194 P.2d 364 (1948). The LeCaves invite us to extend this rule to someone illegally operating a motor vehicle without the requisite insurance. We must decline.

■ The failure to obey the Motor Vehicle Financial Responsibility Law cannot serve as the basis for a claim of active negligence because there is no causal relationship between the failure to purchase insurance and the act of negligently operating a vehicle. In other words, the absence of insurance is not a cause in fact or a contributing cause of an accident. *See Joseph v. Dickerson,* 754 So.2d 912, 913 (La.2000) (holding that a negligent entrustment action cannot be based *solely* on evidence that the driver is uninsured). The purpose of requiring all drivers to be covered under a liability insurance policy, on the other hand, is "to make sure that people who are injured on the highways may collect damage awards, within limits, against negligent motor vehicle operators." *Halpin v. American Family Mut. Ins. Co.,* 823 S.W.2d 479, 482 (Mo. banc 1992).

Still, the circumstances causing a driver to be uninsured may be *evidence* that a driver is incompetent. For instance, if insurance companies refuse to insure a driver because he is too high a risk, or if he can obtain insurance only by paying an exorbitant premium, this may be evidence that provides notice to those aware of his uninsured status that he may be incompetent. Here we hold only that Junior's driving record, along with the circumstances underlying his failure to carry insurance as required under § 303.025, creates a material question of fact as to whether Junior was competent to drive an automobile.

## II. Did Senior Know or Have Reason to Know That Junior Was Incompetent?

■ To prevail in their negligent entrustment claim against Senior the LeCaves must not only prove that Junior was incompetent, but also that Senior knew or should have known of that incompetence. They argue that several facts in the record would allow a jury to find that Senior knew or should have known that Junior was incompetent. They point to the number of Junior's tickets; that Junior and Senior lived together; that Senior wrote checks to pay for some of Junior's tickets; that he knew Junior's license had been suspended; and that he knew his own insurance company specifically excluded Junior from coverage and that Junior did not have auto insurance of his own. The LeCaves argue that this evidence is sufficient to show that Senior knew or should have known that Junior was incompetent to drive. We agree.

■ Simply because Senior testified by deposition that he only knew of the tickets Junior received in 1993 does not mean that the jury could not reasonably disbelieve him, or find that he should have known of the other tickets. Courts are more likely to find that a person has a duty to know of a family member's driving record and habits than that of a stranger for the obvious reason that family members have greater opportunity to observe those habits. *See, e.g., Thompson,* 235 So.2d at 858; *Swicegood,* 459 S.E.2d at 208. In *Thompson* the court said:

> We think that the driving offenses, the convictions, and the fines against

Ross Havard were of such nature, character, and frequency, that *when considered with his child relationship and residence with his mother,* Mrs. Havard, constituted circumstances justifying the submission to the jury of the question of whether the acts came to her knowledge, or would have, had she exercised reasonable care.

235 So.2d at 858 (emphasis added).

Junior is the son of and lived with Senior. Senior admits knowing of some of Junior's tickets, and even wrote checks to pay for some of them. Senior knew that his insurer specifically excluded Junior from coverage and that Junior did not carry insurance of his own. We believe these facts, taken together, create a material question of fact as to whether Senior knew or should have known of his son's driving habits, record and alleged incompetence.

### III. Did Senior Entrust the Camaro to Junior?

The LeCaves must also prove that Senior entrusted the Camaro to Junior. Entrustment may be proven by either express or implied permission. *Rainey By and Through Rainey v. Pitera By and Through Pitera,* 273 Ill.App.3d 234, 209 Ill.Dec. 569, 651 N.E.2d 747, 749–50 (1995). "Implied permission exists when a course of conduct or relationship between the parties includes a mutual acquiescence or lack of objection under circumstances signifying permission" or the giving of consent. *Id.* But implied permission can be found only where there is an absence of proof that the owner has either given or denied express permission. *Trobaugh v. Farmers Insurance Exchange,* 623 N.W.2d 497, 507 (S.D.2001) (dissenting opinion) (citing *Tristan v. Government Employees Ins. Co.,* 489 S.W.2d 365, 367 (Tex.Civ.App.1972)). If the owner has expressly denied a third party permission to drive, then implied permission is not analyzed.

Senior argues that because both he and Junior testified that Senior had expressly denied Junior permission to drive the Camaro that night, it is impossible for the LeCaves to prove entrustment. According to the deposition testimony of Junior and Senior, Junior got into the Camaro on the evening of the accident and was about to leave when Senior told him that he could not take the Camaro. According to Senior, they got into an argument and he told Junior not to drive the Camaro because he was not insured to drive that car. Senior testified further that he wanted Junior to drive a Fiat that Senior owned, though he knew Junior was not insured on that vehicle either. According to their testimony, Junior disregarded his father's command and left with the Camaro. Senior argues that he is entitled to summary judgment because the LeCaves have not offered any evidence to counter their deposition testimony regarding what happened on the night of the accident. While it may be true that the LeCaves cannot offer *direct* evidence contradicting Junior and Senior's testimony that Senior expressly denied Junior permission to drive the Camaro, the indirect evidence and the reasonable inferences therefrom are sufficient for a jury to disbelieve their story.

First, the evidence shows that shortly after the accident, Junior told St. Louis County Police Officer Nick Wild that he "customarily drove" the Camaro "back and forth from school." After this suit was filed Junior recanted that story and claimed he was *never* given permission to drive Senior's Camaro. But this testimony was contradicted by Senior, who admitted that on at least one occasion he had given Junior permission to use the Camaro. Second, Senior's claim that he did not al-

low Junior to drive the Camaro because Junior was not insured to drive that car appears in glaring contradiction to the standing permission. Junior had to drive Senior's Fiat, on which Junior was also uninsured. There is, in short, sufficient evidence for a jury to disbelieve the Hardys' story that Senior expressly denied Junior permission to drive the Camaro.

We also believe there is sufficient evidence for a jury to believe that Senior gave implied permission for Junior to drive the Camaro. A finding of implied permission may be based upon a course of conduct, the relationship between the parties, or a lack of objection that indicates the existence of consent. *Kosrow v. Acker*, 188 Ill.App.3d 778, 136 Ill.Dec. 118, 544 N.E.2d 804, 807 (1989). Generally, if the relationship is one of blood, weaker evidence will support a finding of permissive use. *See Elkinton v. California State Auto. Assn., Int. Ins. Bur.*, 173 Cal.App.2d 338, 343 P.2d 396 (1959); *Derusha v. Iowa National Mutual*, 49 Wis.2d 220, 181 N.W.2d 481 (1970); *Eckels v. Johnson*, 96 Idaho 264, 526 P.2d 1100 (1974).

It is undisputed that Senior left the keys to the Camaro in the ignition, despite his knowledge of Junior's driving record, that Junior's car was inoperative, and that Junior routinely drove to work and school several miles from where he and Senior lived. According to the Restatement (Second) of Torts § 308 (1965),

> It is negligence to permit a third person to use a thing or to engage in an activity which is under the control of the actor, if the actor knows or should know that such person intends or is likely to use the thing or to conduct himself in the activity in such a manner as to create an unreasonable risk of harm to others.

Here Senior knew that Junior was likely to need a car to get to and from work and school. If Senior was serious about preventing Junior from driving the Camaro, he could have simply removed the keys from the ignition. The failure to do so raises an inference of implied consent. *Taitt v. Robinson*, 266 Ill.App.3d 130, 203 Ill.Dec. 334, 639 N.E.2d 893, 896 (1994). Given these facts and the father-son relationship between Junior and Senior, sufficient facts were presented to preclude summary judgment on the question of whether or not Senior gave implied consent for Junior to drive the Camaro.

The judgment of the trial court is reversed and remanded.

PAUL J. SIMON, and SHERRI B. SULLIVAN, JJ., concur.