# Illinois Official Reports

## Appellate Court

---

### *State Farm Mutual Automobile Insurance Co. v. Osborne,*
### 2020 IL App (5th) 190060

---

| | |
|---|---|
| Appellate Court Caption | STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Plaintiff-Appellant, v. MICHAEL OSBORNE; ANNA OSBORNE; CONNIE BUSH, as Independent Administrator of the Estate of Michael Furlow, Deceased; and KIMBERLY INGOLDSBY, Individually, as Mother and Next Friend of Clayton Flood, a Minor, and as Independent Administrator of the Estate of Halle Young, Deceased, Defendants-Appellees. |
| District & No. | Fifth District<br>No. 5-19-0060 |
| Filed | March 25, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Franklin County, No. 16-MR-85; the Hon. Thomas J. Foster, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Bedesky, of Heyl, Royster, Voelker & Allen, and Martin K. Morrissey and Dominique N. Seymoure, of Reed, Armstrong, Mudge & Morrissey, PC, both of Edwardsville, for appellant.<br><br>William A. Alexander and Matthew H. Caraway, of Sam C. Mitchell & Associates, of West Frankfort, for appellee Connie Bush. |

Mark D. Hassakis and James M. Ruppert, of Hassakis & Hassakis, PC, of Mt. Vernon, for appellee Kimberly Ingoldsby.

No brief filed for other appellees.

Panel                    JUSTICE BOIE delivered the judgment of the court, with opinion. Presiding Justice Welch and Justice Moore concurred in the judgment and opinion.


**OPINION**


¶ 1        This case arises out of a head-on automobile collision that occurred on June 21, 2015, in Fulton County, Georgia. The accident involved a 2015 Chrysler (Hertz rental car) that defendant, Michael Osborne, rented from Hertz Corporation (Hertz). The passengers in the Hertz rental car included Michael Furlow, Halle Young, and Clayton Flood. Furlow and Young died from injuries sustained in the accident. Flood survived the accident but sustained severe injuries.

¶ 2        At the time of the accident, Michael and his wife, Anna Osborne, owned a 2004 Chevrolet Suburban that they insured with the plaintiff, State Farm Mutual Automobile Insurance Company (State Farm). In this decision we will refer to this policy as "the State Farm auto policy." This appeal centers on the interpretation of the language of this policy. The defendants, Connie Bush, as independent administrator of the estate of Furlow, deceased, and Kimberly Ingoldsby, individually, as mother and next friend of Flood, a minor, and as independent administrator of the estate of Young, deceased, maintain that the State Farm auto policy provided Furlow, Young, and Flood with coverage under the policy's medical payments coverage and under its underinsured motor vehicle coverage. State Farm disagrees with the defendants' interpretation of the policy and filed a declaratory judgment action seeking a judgment declaring that there was no coverage under the policy.

¶ 3        All parties filed cross-motions for summary judgment. The circuit court ruled against State Farm and entered a summary judgment holding that the State Farm auto policy provided coverage for Furlow, Young, and Flood's injuries because the Hertz rental car qualified as a "Temporary Substitute Car" under the policy's language. State Farm now appeals the circuit court's judgment. For the following reasons, we reverse and remand with directions for the circuit court to enter a summary judgment in favor of State Farm.


¶ 4                                    BACKGROUND

¶ 5        The only issue before us in this case is the interpretation of the language of the State Farm auto insurance policy. There are no disputed issues of fact.

¶ 6        On June 20, 2015, Michael rented the Hertz rental car to drive to Florida with another adult, Furlow, and three children, Young, Flood, and Kaybrin Osborne. They left for Florida in the Hertz rental car the same day. The next day, June 21, 2015, while Michael drove the Hertz

rental car on I-75 near Atlanta, Georgia, another individual, Jorge Solis, drove a Ford F-350 truck in the wrong direction on the interstate. Solis collided head-on with the Hertz rental car. Furlow and Young died from injuries sustained in the accident, and Flood sustained serious physical injuries. Kaybrin Osborne also died from injuries sustained in the accident. Insurance coverage for his injuries is not at issue in this proceeding.

¶ 7    Solis's vehicle liability insurance carrier tendered its policy limits for claims against Solis stemming from the accident. Hertz or its insurance carrier tendered the policy limits of Hertz's underinsured motorist coverage. These funds were divided among the five occupants of the rental car, including Furlow, Young, and Flood.

¶ 8    At the time of the accident, the State Farm auto policy provided that State Farm would pay for medical expenses for bodily injuries sustained by an "Insured" involved in a motor vehicle accident. The policy also provided that State Farm would pay for medical expenses for bodily injuries sustained by an "Insured" when the insured is entitled to recover from the owner or driver of an underinsured vehicle. Michael and Anna Osborne were the named insureds on the policy's declarations page. The defendants sought coverage for Furlow, Young, and Flood's injuries as additional insureds under the State Farm auto policy. Whether the State Farm auto policy covered Furlow, Young, and Flood's injuries depends on whether the Hertz rental car qualified as a "Temporary Replacement Car," as that term is defined in the State Farm auto policy.

¶ 9    Specifically, resolution of this appeal is controlled by the following definitions contained within the State Farm auto policy:

"DEFINITIONS

* * *

Newly Acquired Car means a car newly owned by you ***

* * *

Non-Owned Car means a car that is in the lawful possession of you or any resident relative and that neither:

    1. is owned by;

      a. you ***

    2. has been operated by, rented by, or in the possession of:

      a. you ***

during any part of each of the thirty one or more consecutive days immediately prior to the date of the accident or loss.

* * *

Resident Relative means a person other than you, who resides primarily with the first person shown as a named insured on the Declarations Page and who is:

    1. related to that named insured or his or her spouse by blood, marriage, or adoption ***

* * *

Temporary Substitute Car means a car that is in the lawful possession of the person operating it and that:

    1. replaces your car for a short time while your car is out of use due to its:

      a. breakdown;

  b. repair;

  c. servicing;

  d. damage; or

  e. theft; and

 2. neither you nor the person operating it own or have registered.

If a car qualifies as both a non-owned car and a temporary substitute car, then it is considered a temporary substitute car only.

* * *

 You or your means the named insured or named insured shown on the Declarations Page. ***

 Your Car means the vehicle shown under 'YOUR CAR' on the Declarations Page. ***

* * *

MEDICAL PAYMENTS COVERAGE

* * *

Additional Definitions

Insured means:

 1. you and resident relatives:

  a. while occupying;

   (1) your car;

   (2) a newly acquired car;

   (3) a temporary substitute car;

   (4) a non-owned car; or

   (5) a trailer ***

* * *

 2. any other person while occupying:

  a. your car;

  b. a newly acquired car;

  c. a temporary substitute car; or

  d. a trailer ***

* * *

UNDERINSURED MOTOR VEHICLE COVERAGE—BODILY INJURY

* * *

Insured means:

 1. you;

 2. resident relatives;

 3. any other person while occupying:

  a. your car;

  b. a newly acquired car; or

  c. a temporary substitute car.

Such vehicle must be used within the scope of your consent ***."

¶ 10    Applying the above definitions to the facts of this case, it is undisputed that Furlow, Young, and Flood were not the Osbornes' "Resident Relative[s]" as that term is defined in the policy. If they had been the Osbornes' resident relatives, they would have been covered under the policy's medical payments coverage as "Insured[s]" because they were passengers in a "Non-Owned Car" at the time of the accident. However, under the above definitions, in order for nonresident relatives to qualify as "Insured[s]," the vehicle involved in the accident must be one of the following: (1) the Osbornes' car, (2) a car newly owned by the Osbornes, or (3) a "Temporary Substitute Car." As stated, the parties' dispute in this case centers on whether the Hertz rental car qualified as a "Temporary Substitute Car." Whether the Hertz rental car qualified as a "Temporary Substitute Car," in turn, depends on whether the Osbornes' insured vehicle, the Suburban, was "out of use" due to its "breakdown, repair, servicing, damage, or theft."

¶ 11    On June 22, 2016, State Farm filed a complaint for declaratory judgment against the defendants asking the circuit court to determine that the State Farm auto policy did not provide coverage for Furlow, Young, or Flood's injuries. Both State Farm and the defendants filed cross-motions for summary judgment asking the court to enter a judgment in their favor as a matter of law. The parties' respective motions for summary judgment were supported by the deposition testimony of Anna and Michael Osborne. Their deposition testimony focused on facts relevant to whether their Suburban was out of use due to breakdown, repair, servicing, or damage.

¶ 12    Anna testified that she and Michael purchased the 2004 Suburban in 2013. She stated that she used the Suburban as a process server and that the Suburban had between 130,000 and 150,000 miles on it as of June 21, 2015, the day of the accident. She believed that when they purchased the Suburban it "probably" had less than 100,000 miles.

¶ 13    Anna testified that she and Michael were concerned that the Suburban was unsafe, would not make it to Florida, and could break down along the way. When asked whether there were repairs needed to the Suburban as of June 21, 2015, that would have made the Suburban safer to drive to Florida and back, Anna answered, "There was [*sic*] already repairs made to the Suburban, yes, prior to that." She explained that, prior to June 21, 2015, they had replaced the Suburban's tires, alternator, and battery. She added, "I'm not for sure if it needed anything else right now." Anna testified that Michael did not take the Suburban to Florida because "it had too many miles on it." She was asked, "Other than the fact it had high mileage, any other concerns that you had as to why it wouldn't make the trip," and she responded, "Just in case it broke down." However, she stated that it had not broken down prior to the day Michael rented the Hertz rental car.

¶ 14    When asked again what repairs were needed to make the Suburban safer before June 20, 2015, she replied, "I'm not sure. I know the [air conditioner] wasn't working on there [*sic*], and it was very hot for the kids to ride back in the back." She explained that the front air conditioner worked, but that it did not work in the back part of the Suburban's passenger area. She stated that they did not have anyone look at the air conditioner prior to June 20, 2015, and suggested that there were other repairs needed, but she could not remember what they were.

¶ 15    Anna testified that she would not drive the Suburban "over certain distances." She admitted that she drove the Suburban from Benton to Chesterfield, Missouri, for a doctor's appointment and that on June 20, 2015, the Suburban was "drivable." She admitted that she drove the

Suburban around Benton on June 20, 2015, the day Michael rented the Hertz rental car and left for Florida. She agreed that the Suburban was not "broken down" on June 20, 2015.

¶ 16    During his deposition, Michael was asked whether he believed there was anything unsafe about the Suburban when he rented the Hertz rental car. He responded,

> "When I go on trips, I rent a car, because I had to be back at work Monday and I was going to have three children and another guy that had to be back at work Monday. The main reason was, if you get a blowed [*sic*] tire or engine failure or something, in your own car, you have to wait on a mechanic, try to find somebody. Ours, having high mileage and stuff like that, I didn't trust it, so I rented a car. I didn't know that was a crime."

¶ 17    He added that with a rental car, "You make a phone call, they pick you up and you're in a car and you're gone." He explained that it was his practice to rent a car on long trips, especially when he had kids in the car. He testified, "You're not in a hotel. You're not looking for mechanic Bob that's going to charge you a thousand bucks." When asked about the condition of the Suburban on June 21, 2015, Michael initially testified that he thought the brakes might have been bad but later clarified that he believed that he had them fixed prior to leaving for Florida. He also testified that the Suburban was really his wife's car. He believed that when he obtained the Hertz rental car the Suburban was drivable for short distances. He agreed that it was drivable around town, adding that "it started and ran and drove."

¶ 18    On January 15, 2019, the circuit court entered an order denying State Farm's motion for a summary judgment and granting the defendants' motion for a summary judgment, concluding that the State Farm auto policy provided coverage for Furlow, Young, and Flood's injuries. The circuit court found that the Osbornes' nonspecific fear that the Suburban could breakdown did not constitute "breakdown" under the policy. However, the court concluded that the Suburban's partially functioning air conditioner constituted "damage" to the Suburban and that the Suburban was out of use due to this damage. Therefore, the circuit court concluded, the Hertz rental car qualified as a "Temporary Substitute Car" under the State Farm auto policy. State Farm now appeals the circuit court's summary judgment in favor of the defendants.

¶ 19                                    ANALYSIS

¶ 20    As set out above, the issue before us on appeal concerns the construction of the language of the State Farm auto policy to determine whether there is coverage for Furlow, Young, and Flood's injuries. The policy construction issue is presented to us on review of a summary judgment entered by the circuit court. A summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. *Hess v. Estate of Klamm*, 2020 IL 124649, ¶ 14. "A triable issue precluding summary judgment exists where the material facts are disputed or where, the material facts being undisputed, reasonable persons might draw different inferences from the undisputed facts." *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). By filing cross-motions for summary judgment, the parties in this case agreed that no factual issues existed, and they invited the court to decide the questions presented as a matter of law. *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 432 (2010); *Daniel v. Aon Corp.*, 2011 IL App (1st) 101508, ¶ 17. The applicable standard of review for a summary judgment is *de novo*. *Hess*, 2020 IL 124649, ¶ 14. In addition, when the facts of a case are undisputed and the sole basis for the underlying

judgment is the construction of an insurance policy, review of the judgment presents a question of law that is subject to *de novo* review. *Id.* Our review in this case, therefore, is *de novo*.

¶ 21 Under Illinois law, the general rules governing the interpretation of contracts govern the interpretation of insurance policies. *Hobbs v. Hartford Insurance Co. of the Midwest*, 214 Ill. 2d 11, 17 (2005). The "primary objective" in interpreting an insurance policy is to determine and give effect to the parties' intent as expressed in the policy language. *Id.* Unambiguous policy language is applied as written unless it conflicts with public policy. *Id.* If an insurance provision is ambiguous, however, it will be construed liberally in favor of coverage and strictly against the insurer who drafted the policy. *Id.* Policy language is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* In determining whether policy language is ambiguous, the courts will consider only reasonable constructions of the language, not creative possibilities suggested by the parties. *Hess*, 2020 IL 124649, ¶ 16. The supreme court has directed the courts not to "strain to find ambiguity in an insurance policy where none exists." *McKinney v. Allstate Insurance Co.*, 188 Ill. 2d 493, 497 (1999).

¶ 22 Here, the parties agree that the only interpretation of the policy that would provide coverage for Furlow, Young, and Flood's injuries is one that qualifies the Hertz rental car as a "Temporary Substitute Car" as defined in the policy. The purpose of this type of temporary substitute coverage is to cover situations where the insured's vehicle "becomes unavailable for use for any one of a number of specified reasons, and another vehicle, not owned by the insured, is temporarily used in its place." 8A Steven Plitt et al., Couch on Insurance § 117:61 (3d ed. 2019). Illinois courts have held that this type of coverage is for the benefit of the insured and, if construction is necessary, the language of the coverage is to be construed liberally in favor of the insured. *Standard Mutual Insurance Co. v. Sentry Insurance of Illinois, Inc.*, 146 Ill. App. 3d 905, 910 (1986). However, while this type of provision is to provide additional coverage to an insured, the language used usually defines the coverage "by limiting the insurer's risk to one operating vehicle at a time for a single premium." *Id.* at 910-11.

¶ 23 In the present case, the temporary substitute coverage at issue encompasses two essential phrases: "out of use" and "due to its: breakdown; repair; servicing; damage; or theft." Our analysis focuses only on the "out of use" element of the coverage because the undisputed facts establish that the Suburban was not "out of use" when the accident involving the Hertz rental car occurred.

¶ 24 Although the Suburban had high mileage, during Anna's deposition, she could not identify any mechanical issue with the Suburban that prevented it from operating as a car. In fact, Anna admitted to driving the Suburban on June 20, 2015, the day Michael obtained the Hertz rental car and left for Florida. It does not require extensive analysis to establish that a car being driven on roadways is not "out of use" and has not been temporarily substituted by a different car. Michael testified that the Suburban was really Anna's car, and her testimony established that she continued to use the Suburban as her car after Michael obtained the rental car and left for Florida.

¶ 25 Additionally, Anna testified that she believed the Suburban was not safe to drive to Florida, but she could not identify any mechanical issues that made it unsafe. When asked whether there were repairs needed to the Suburban as of June 21, 2015, which would have made it safer to drive to Florida and back, Anna answered, "There was [*sic*] already repairs made to the Suburban, yes, prior to that." Those repairs included new tires, alternator, and battery. Anna added, "I'm not for sure if it needed anything else right now." Anna testified that she and

Michael were concerned that the Suburban was unsafe, would not make it to Florida, and could break down along the way. She was asked, "Other than the fact it had high mileage, any other concerns that you had as to why it wouldn't make the trip," and she responded, "Just in case it broke down," but she agreed that it was not broken down on the day Michael rented the Hertz rental car.

¶ 26    Likewise, during Michael's deposition, he also did not identify any specific mechanical issues with the Suburban. In addition, he did not testify that he rented the Hertz rental car as a substitute car because the Suburban was out of use. Instead, he testified that it was his practice to rent cars for long trips because if the rental car broke down while traveling, the rental company would give him a replacement vehicle, and he would be on his way with little delay. Therefore, with a broken-down rental car, "You're not in a hotel. You're not looking for mechanic Bob that's going to charge you a thousand bucks." Instead, "You make a phone call, they pick you up and you're in a car and you're gone." However, he explained, if he drove his own vehicle and it broke down, he would have to find a mechanic and have his vehicle repaired while he waited.

¶ 27    Anna's and Michael's testimony, therefore, negated any factual basis to conclude that the Suburban was "out of use" and that the Hertz rental car was its temporary replacement. Instead, Michael obtained the rental car as a matter of his own convenience, and Anna continued to use the Suburban, which was primarily her car, while Michael traveled to Florida.

¶ 28    The only specific mechanical issue with the Suburban that anyone identified was mentioned during Anna's deposition. She explained that the air conditioner was not working in the back of the Suburban. Specifically, Anna testified, "I know the [air conditioner] wasn't working on there [sic], and it was very hot for the kids to ride back in the back." She testified, "The front was working, but the dual back wasn't." That was the entirety of her testimony concerning the extent to which the air conditioner did not properly function. She stated that they did not have anyone look at, or schedule anyone to look at, the Suburban's air conditioner prior to June 20, 2015.

¶ 29    Anna's testimony about the Suburban's air conditioner did not establish that the Suburban was "out of use" and needed to be temporarily replaced. On the day Michael rented the Hertz rental car, Anna continued to use the Suburban as usual; it was not taken out of use for any reason, including any issues with its air conditioner. In addition, the person who rented and drove the Hertz rental car, Michael, was specifically asked about his reasons for obtaining the Hertz rental car for the trip. He never mentioned the Suburban's air conditioner as a reason for obtaining the Hertz rental car for the Florida trip. Instead, he mentioned only a vague and nonspecific concern that the Suburban might break down and explained that it was his practice to rent cars for long trips as a matter of convenience.

¶ 30    The intent of the coverage at issue, established by the policy's plain language, was that nonresident relative passengers of a rental car qualify as "Insured[s]" only when the rental car is used temporarily as a substitute for the Suburban (the insured car) while the Suburban was "out of use." The undisputed facts established that both vehicles, the Hertz rental car and the Suburban, were on the road at the same time and that the Hertz rental car was used in addition to the Suburban, not as a substitution for the Suburban. We find no reasonable interpretation of the policy that would qualify the Hertz rental car as a temporary substitute car under these facts. Therefore, the circuit court should have entered summary judgment in favor of State Farm.

¶ 31    The defendants argue that, although the Osbornes drove the Suburban before and after obtaining the Hertz rental car, the Suburban was, nonetheless, "out of use" with respect to long, out-of-town trips, such as the trip to Florida. We disagree. Segregating the "use" of the Suburban in the manner suggested by the defendants would require the insurance company to bear the risk of loss of two vehicles being operated simultaneously on the roadways for one premium, the "use" of one vehicle being out of town and the "use" of the other vehicle being in town. We believe the unambiguous language of the policy establishes that the intent was that the coverage applied to only one operating vehicle at a time.

¶ 32    *Prudence Mutual Casualty Co. v. Sturms*, 37 Ill. App. 2d 304 (1962), offers useful guidance in evaluating the merits of the defendants' argument. In that case, a college student's Chevrolet needed clutch repair while he was home from college. The student's father took the Chevrolet in for repair while the student took his father's truck to travel from Chicago back to college in Cincinnati. *Id.* at 305. The Chevrolet was repaired three or four days later, and the father placed it in his garage to store it until the student returned. *Id.* The student continued to use the father's truck for approximately one month and was in an accident returning to Chicago. *Id.* at 305-06. The court held that, even though the Chevrolet had been repaired weeks earlier, it was still removed from normal use while being stored in the father's garage. *Id.* at 307. Important to our analysis, the *Sturms* court reasoned, "the essential purpose of the limitation placed on the clause, *i.e.*, *to avoid the possibility of having more than one car covered at the same time*, was satisfied." (Emphasis added.) *Id.*

¶ 33    Likewise, in *Atkinson v. State Farm Mutual Automobile Insurance Co.*, 480 N.E.2d 819, 821 (Ohio Ct. App. 1984), the court noted that the

> "purpose of the 'temporary substitute' clause in an automobile liability policy is to afford continuous coverage to an insured while *limiting risk to one operating vehicle at a time* for a single premium, and, therefore the insured vehicle for which the substitution is made must be withdrawn from use by some overt act which would reasonably *preclude the possibility of both vehicles being driven at the same time*." (Emphases added.)

¶ 34    In another case we find persuasive, *Erickson v. Genisot*, 33 N.W.2d 803, 803 (Mich. 1948), an insured truck was 10 years old and "in poor running order," sometimes not running at all. Nonetheless, the truck was still used by the owner to haul mail, make service calls, and transport him to and from home and his place of business. *Id.* The truck owner borrowed a car when he had to travel a distance that he felt was too far for the truck and was involved in an accident on the trip. *Id.* at 804. In determining whether coverage for a temporary replacement vehicle applied, the *Erickson* court held that the truck had not been withdrawn from use and, instead, had been used before, on the day of, and days after the accident by the truck owner's employees. *Id.* The *Erickson* court rejected an argument that temporary replacement car coverage should apply if the truck had been withdrawn from "some portion of what had formally been its normal use." *Id.* The court held that for the policy coverage to apply, the truck had to be withdrawn from all normal use. *Id.*

¶ 35    Likewise, in the present case, as we explained, the Suburban was not "out of use," and instead, Michael secured the Hertz rental car as a matter of preference or convenience. Accordingly, the circuit court incorrectly held that the Hertz rental car qualified as a "Temporary Substitute Car" under the policy, thereby extending coverage to Furlow, Young, and Flood contrary to the policy's language.

¶ 36     The defendants cite *Economy Fire & Casualty Co. v. Dean-Colomb*, 269 Ill. App. 3d 603 (1995), in support of their interpretation of the policy. In that case, an insured who had an automobile policy for a Ford Tempo rented another vehicle for a trip to Louisiana. *Id.* at 604-05. The insured elected not to take the Tempo because "of its high mileage *** and fuel line problems." *Id.* at 605. The insured's brother was injured in an accident while using the rental car on the trip. *Id.* The insurance company denied coverage for the accident, and the insured brought a declaratory judgment action against the insurance company requesting the court to determine that her automobile policy covered a rental car. Both parties filed cross-motions for summary judgment. *Id.*

¶ 37     The auto policy at issue in *Dean-Colomb* covered any vehicle that the insured did not own " 'while used as a temporary substitute for any [covered vehicle] which [was] out of *normal use* because of its breakdown, repair, servicing, loss or destruction.' " (Emphasis added.) *Id.* at 604. The trial court found that when the insured rented the car, the Tempo was drivable, was not scheduled for maintenance or repair, and was not undergoing any repairs. *Id.* at 605. The insured left the Tempo in her driveway when she traveled to Louisiana. The Tempo had 80,000 to 90,000 miles on it. *Id.* Also, according to the insured, the Tempo " 'didn't seem to be getting gas,' " was idling high, and had not started or had stalled in the two months prior to the Louisiana trip. *Id.* at 606. The insured " 'felt that probably maybe the fuel injection system needed to be cleaned and probably a tune-up.' " *Id.* Based on these findings, the trial court concluded that the rental car did not qualify as a temporary substitute car and was, therefore, excluded from coverage.

¶ 38     On appeal, in determining what constitutes "being withdrawn from normal use because of breakdown, repair, and servicing" (*id.* at 605), the *Dean-Colomb* court noted that it must consider the term "normal use" as it might modify the term "breakdown" (*id.* at 607). In considering the term "normal use," the *Dean-Colomb* court stated that if it "determine[d] that normal use [did] not include occasional trips to meetings and to visit family, and only includes driving within the community where the insured lives, then it would appear the automobile coverage was limited because the insured's vehicle was operational for normal use." (Internal quotation marks omitted.) *Id.* The court, however, noted that this limited definition was unrealistic because "[a]n obvious use for automobiles includes out-of-town trips." *Id.* The court, therefore, went on to consider whether "*fear* of a breakdown amounts to a 'breakdown.' " (Emphasis added.) *Id.*

¶ 39     Here, the defendants argue that, because the Tempo in *Dean-Colomb* was not taken out of town due to its mechanical issues, the *Dean-Colomb* court considered the Tempo to be out of "normal use," which included out-of-town trips, and the court, therefore, had to analyze whether this was due to "breakdown." Accordingly, the defendants argue, the Osbornes' suburban was, likewise, out of use with respect to out-of-town trips and we must analyze whether this was due to breakdown, damage, or repair.

¶ 40     We disagree with the defendants' analysis and conclude that *Dean-Colomb* is distinguishable and offers no useful guidance in evaluating whether the Osbornes' Suburban was "out of use." First, the policy language in the present case does not qualify the term "use" as the policy did in *Dean Colomb*; the State Farm auto policy requires that the Suburban be "out of use," not simply out of "normal use." Second, there are no facts in *Dean-Colomb* that suggested that the insured continued to use the Tempo while also using the rental car. The Tempo was parked in the insured's driveway when she went on her trip. Here, as we explained

above, Anna continued to use the Suburban after Michael obtained the Hertz rental car. She drove the Suburban on the day Michael left for Florida. When asked whether she used the Suburban the next day, the day of the accident, she stated that she did not because the accident in Georgia happened before she got out of bed for the day. Again, this testimony implies that the Suburban was not "out of use," but that Anna would have continued to use the Suburban on June 21, 2015, but for the accident.

¶ 41 To the extent that the *Dean-Colomb* court's reasoning might suggest that the Osbornes' Suburban was "out of use" because Michael elected not to take it to Florida, we reject that analysis for the reasons we have explained. Qualifying the Hertz rental car as a "Temporary Substitute Car" while the insureds used both vehicles would increase the policy's coverage to two vehicles for the one premium, thereby increasing "the risk on the insurance company without a corresponding increase in the premium." (Internal quotation marks omitted.) *State Farm Mutual Automobile Insurance Co. v. Western Casualty & Surety Co.*, 477 S.W.2d 421, 424 (Mo. 1972); see also *Houston General Insurance Co. v. American Fence Co.*, 115 F.3d 805, 808 (10th Cir. 1997) ("Rather than being used in place of the insured vehicle, the 1986 pickup was being used in addition to it for reasons of convenience.").

¶ 42 As we stated above, the coverage at issue encompasses two essential phrases: "out of use" and "due to its: breakdown; repair; servicing; damage; or theft." Our analysis focuses on the "out of use" element of the coverage. In its order, the circuit court focused on the definitions of breakdown, repair, and damage, concluding that the Suburban's partially functioning air conditioner constituted "damage" to the Suburban and that the Suburban was out of use due to this damage. In their briefs, the parties also discuss whether the partially functioning air conditioner qualified as breakdown, repair, or damage. However, because we conclude that the Suburban was not "out of use," we need not interpret the language of the policy to determine whether a partially functioning air conditioner could qualify as breakdown, repair, or damage under the temporary replacement vehicle coverage of the policy.[1]

¶ 43 Sadly, we recognize the horrible loss suffered by the defendants and their families in the tragic head-on collision that lies at the heart of this case. However, no matter how much the courts want to help the defendants and their families, the courts do not have power to extend insurance coverage beyond that provided by the unambiguous language in the policy. Accordingly, we are obligated to reverse the circuit court's summary judgment in favor of the defendants and direct the circuit court to enter a summary judgment in favor of State Farm.

¶ 44 Finally, we note that State Farm filed a motion to strike those portions of the defendants' brief in which they challenged the circuit court's conclusions that the Suburban was not out of use due to "breakdown" or "repair." State Farm argues that the defendants were required to

---

[1]The circuit court found that driving the children to Florida in the Suburban would have been "dangerous, unsafe, and maybe even criminal" as it would have endangered "the life or health of young children by transporting them in the rear of the Suburban without air conditioning." Although not relevant to our analysis, we feel compelled to note that the record does not support this finding. Anna's testimony with respect to the Suburban's air conditioner was, "The front was working, but the dual back wasn't." The record does not include any evidence concerning how hot any area of the passenger compartment of the Suburban could get in 87-degree weather with only the front air conditioner blowing cold air into the passenger area of the vehicle. Accordingly, there is no evidence in the record from which the circuit court could find that the temperature in any area of the interior of the suburban would be dangerous to the children on the trip to Florida.

- 11 -

file a cross-appeal in order to raise those issues. In light of our reversal of the circuit court's summary judgment based on our conclusion that the Suburban was not "out of use," we deny the motion to strike as moot.

¶ 45                                    CONCLUSION

¶ 46        For the foregoing reasons, we reverse the circuit court's summary judgment in favor of the defendants and remand with instructions for the circuit court to enter a summary judgment in favor of the plaintiff.

¶ 47        Reversed and remanded with directions.